# ABRAMS *v.* ABRAMS

[No. 343, September Term, 1966.]

*Decided May 4, 1967.*

*Motion for rehearing filed on May 12, 1967, denied June 1, 1967. Opinion modified.*

The cause was argued before HORNEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*Francis N. Iglehart,* with whom were *Brune, Robertson & Iglehart* on the brief for appellant.

*Fred C. Sacks* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The parties were married in April 1956. Of happiness they tasted naught. The appellant (Abrams) turned out to be a great disappointment to his bride (appellee) not so much that he was not rich but because he had no desire to get rich. He wanted to be a teacher.

Abrams' father had been successful in business and in 1956 he was an executive of Meadowgold Ice Cream Company. He provided about half of the purchase price of the home the young couple moved into after their marriage and he persuaded Meadowgold to employ the groom as assistant sales manager. Unfortunately, Abrams, Sr. died in May 1957. Not long thereafter management decided Meadowgold could get along quite well without the services of Abrams. He said after he was "fired * * * he wanted to go out and get a job * * * [but his] wife wouldn't let" him. Although he "knew nothing of real estate or how to get in the real estate business" he succumbed to the pressures of the appellee and, on a financial statement "dreamed up" by appellee's father, he borrowed money, bought some land and built a small shopping center. He testified he "got back out [the] money that was put in" but no more. This was the high water mark of his business career. Thereafter he became incredibly inept. One venture after another failed. Disaster finally overtook him in October 1962. On a Monday morning he left home and went, not to the office, but to a motel on Pulaski Highway. He swallowed what he supposed was an overdose of barbiturates. His attempt to destroy himself was also a failure. "They told me nine would kill me," he said, "but I took fourteen and I can't understand it."

Under a commitment signed by the appellee Abrams was admitted to The Seton Psychiatric Institute. The admission diagnosis was, "Psychoneurotic disorder. Depressive reaction."

In the case history the appellee is described as being "a fairly attractive 26 year old woman, who seemed to be more concerned about her finances * * * rather than the patient's condition." Late in December Abrams was discharged in the care of his mother, who paid the hospital bill and who had been making the mortgage payments on his home. Within a few months he obtained employment as a social worker. His take-home pay was about $80 per week.

Ten days later appellee filed a bill of complaint asking for permanent alimony, support for their infant daughter, costs and counsel fees. During the 3½ years between the filing of the bill of complaint and the trial in the court below she was represented successively by eight attorneys. The record indicates the payment of approximately $5,000 to those attorneys. It is not clear why all but present counsel withdrew. It is worth noting, however, that one firm returned a $1,000 retainer a month after they had been engaged by appellee.

After four days of testimony, concerned almost exclusively with money, the trial judge

(a) dismissed Abrams' cross bill,

(b) awarded custody of the daughter to appellee, subject to reasonable rights of visitation,

(c) awarded appellee $75 per week alimony and $25 per week for the support of the child,

(d) ordered Abrams to pay $4,500 retroactive temporary alimony and support, and

(e) ordered Abrams to pay the costs and $2,000 to appellee's attorney.

## I.

Abrams, in his first three contentions, says the trial judge erred in that she not only ignored the evidence as to his net worth but that she speculated as to its liquidity. He charges further that she failed to consider appellee's contribution to the destruction of the marriage and that the retroactive award of alimony, pendente lite, was also erroneous.

The trial judge doubted that "Abrams was a successful businessman." She felt that "he lacked business acumen for this type of work [real estate entrepreneur]; * * * [that] he just

apparently was not cut out for it." She was convinced that he "had access to a lot of money * * * [and that] there is little, if any, of that money left." She said she could find no evidence "that he has any of that money now." She did not think "Abrams ha[d] deliberately lessened his earning capacity * * * [or that he] has the capacity to earn the large amounts of money which his wife seems to think he can earn." She went on to say:

"Looking at his financial status at this time, he is working now for the City of Baltimore in the capacity of a Social Worker, earning a little over a hundred dollars a week gross, $80 a week take home pay. This is not his only source of income. It is obvious to the court that Mr. Abrams has other assets, specifically the one-third interest in the trust estate set up under his father's will, which the Equitable Trust is handling. He has a one-third interest in a trust established by his mother, which I believe is comprised of about 2800 shares of stock in the Dolfield stock, the monetary value of which has not been determined, and included in this one-third interest in the trust estate is this twelve-thousand, three hundred and some odd dollars Dolfield Shopping Center Loan, and more importantly there is a valuable piece of real estate adjacent to or near the Dolfield Shopping Center. The exact value of this property has not been established before this court. Mr. McCartin, the trust officer handling the estate, did admit quite candidly that the $3,330 figure does not in any way represent Mr. Abrams' true interest in this property. In fact, about a year ago there were negotiations for the sale of this property which got so far as a written contract, indicating that this property then was valued at $53,000, at least for the purpose of that contract it was. There was some difficulty regarding zoning and also in obtaining Mrs. Abrams' signature, and the contract was not consummated.

"I do not presume to make a precise finding of fact

on the value of that property, but there is sufficient evidence concerning Mr. Abrams' interest in these trusts to convince this court that he is by no means a destitute man. He has considerable assets available to him, and it is further clear, and in fact has been stipulated, that there is available the sum of $5,000 to Mr. Abrams from this trust estate, the only impediment at the present time being, I believe, a suit which has been filed by Mrs. Abrams. When that impediment is withdrawn, he can immediately obtain $5,000 from the trust estate, so while perhaps Mr. Abrams does not have too much ready cash coming in through his hands, he does have assets available to him, and I might comment that all these assets are actually owned by the Abrams family. There is no one else in on it, as far as I can ascertain; they more or less control the Dolfield stock and everything else that goes with Dolfield. I merely mention that to indicate that perhaps there is not the difficulty which might otherwise be present in obtaining some of this money, or at least reducing the assets to money, since Mr. Abrams and his family do control the whole works, and they are now on very friendly and amicable terms."

\* \* \*

"In addition to the $80 a week which he has coming in, he has the interest in these trusts, which I have mentioned, and should he find it necessary to convert some of these interests to cash in order to meet his financial obligations to his wife and child, I believe it can be done, and it must be done. \* \* \* [A]s I have said before, the family is the sole owner of the Dolfield interests, and I do not believe that liquidating some of these interests to cash would be quite as difficult as it might appear."

While there may be "sufficient evidence to convince" the trial judge that Abrams "is by no means a destitute man," we have been unable to reach quite the same conclusion. It is agreed he can get $5,000 in cash (which is principal, not in-

come) from the trustee under his father's will, but only if appellee agrees to dismiss an injunction proceeding brought by her against the trustee. It is also agreed that $1,600 (support tendered to but refused by the appellee) being held in escrow by counsel is available. The value of the "other assets" mentioned by the court depends upon highly speculative future contingencies and they are difficult, if not impossible, of liquidation under present circumstances. Moreover, Abrams is only a life tenant in respect of the Dolfield trust, presently producing little or no income, and the beneficiary of an undivided ⅓ interest in the land, of doubtful value, owned by the other trust. The court believed Abrams "can convert some of these interests to cash" to meet his obligations and that it should not be difficult because "Abrams and his family do control the whole works." Indeed, she declared, "it must be done." It is immediately obvious, of course, that the payment of the alimony, pendente lite, ($4,500) and the counsel fee ($2,000) will consume most of the available cash. About $100 would remain for the payment of costs which in the trial court alone are in excess of $1,000. The trial judge said she was "fully aware" that the alimony and support "exceed Abrams' take home pay;" but, she added, "he does have considerable assets which he will have to draw on, if it comes down to that." She thought it was neither "an unreasonable amount, nor * * * an impossible amount, in view of his various interests in these trusts." Since, as we see it, there is no intelligible evidence that Abrams has access to any property (other than the $6,600 above mentioned) which he can turn into cash, the court must have assumed that his mother would give him what might be needed. She commented, in her opinion, that "his mother has been very generous with him." We have said, however, that when the husband owns no property, the court cannot base the award of alimony upon a hope of gratuities or a mere surmise that he will receive them. *Timanus v. Timanus,* 178 Md. 640, 643, 16 A. 2d 918 (1940). See also *Newmeyer v. Newmeyer,* 216 Md. 431, 140 A. 2d 892 (1958) ; *Lewis v. Lewis,* 219 Md. 313, 149 A. 2d 403 (1959) ; *Kapneck v. Kapneck,* 235 Md. 366, 201 A. 2d 798 (1964) ; and *Pet v. Pet,* 238 Md. 492, 209 A. 2d 572 (1965). In our judgment, there is little

or no support in this record for an award which exceeds the husband's income by 25%. Nor can we, on the same scanty and inconclusive evidence, undertake to say what the proper amount should be. We shall remand the case, therefore, so that the trial judge can require the parties to produce more precise and informative testimony in respect of the value, earning power, liquidity and accessibility of the assets in any trust in which Abrams has a beneficial interest and upon that testimony make a more realistic determination of the amount of alimony and support to be paid to the appellee. Our holding in *Newmeyer, supra,* suggests a tenable solution of the problem.

We cannot agree that the trial judge, in awarding alimony, failed to consider appellee's contribution to the erosion of their marriage. Appellee does emerge from the testimony as a somewhat less than admirable person. The court mentioned her husband's reference to "her insatiable desire for money." There was testimony that Abrams, Sr. once said to her, "Did you marry Meadowgold or Isadore?" On another occasion, while driving to Seton Psychiatric Institute to see her husband she said, according to Abrams' sister, "Next thing I know this ring (5 carat diamond) will turn out to be glass." There is little doubt that at the time she was an exquisite judge of quantity. Nevertheless, the court was unable to "find from the evidence that there was conduct on her part which compelled" Abrams to leave the home. How much consideration the chancellor gave these matters in awarding the alimony we cannot say. Neither can we say she did not consider them.

In our judgment Abrams' contention that appellee has waived her right to alimony pendente lite finds insufficient support in the record. However, having in mind what we have said about the alimony, it follows that the award of alimony pendente lite also will have to be reconsidered. Abrams suggests that in *Newmeyer, supra,* we approved the unwritten Harford County rule limiting alimony pendente lite to 10 weeks. In *Newmeyer* the case was tried a year after the separation. In the case at bar 3½ years elapsed. The trial judge did not explain why she chose 45 weeks, but it will be observed that 45 weeks is to 182 weeks (3½ years) about as 10 weeks is to 52 weeks. We cannot say

her choice of 45 weeks, in the circumstances, was erroneous. However, it must not be supposed that our comparison of the ratio in *Newmeyer* with the ratio in the case at bar rises above dictum.

## II.

Abrams next contends that the counsel fee is excessive. The trial judge thought counsel had earned, by minimum standards, the $4,500 he asked for, yet she allowed him only $2,000. We see no abuse of discretion.

## III.

When separate maintenance or permanent alimony is sought, the evidence must be such as would entitle the wife to a divorce had she asked for that relief, *Hoffman v. Hoffman,* 241 Md. 118, 215 A. 2d 808 (1966), and the same requirement as to corroboration is necessary. *Leonhard v. Leonhard,* 238 Md. 489, 491, 209 A. 2d 602 (1965). Abrams argues that because appellee's conduct amounts to equal fault she would not be entitled to a decree *a mensa* and that permanent alimony must, therefore, be denied. The trial judge said she had "no difficulty in finding, as a matter of fact and law, that Mr. Abrams, for his own reasons, chose to leave the marital home, and by doing so, under the facts * * * [as she found] them to be, he abandoned and deserted his wife." In our judgment the evidence does not justify our holding that the court's finding was clearly erroneous. This case is not unlike *Hoffman, supra,* where the wife was "a fanatical house-cleaner." Judge Oppenheimer, who delivered the Court's opinion, said, "Excessive house-cleaning may not be a lubricant for a happy marriage, but it is not constructive desertion." Neither, in our opinion, is persistent preoccupation with money, or the lack of it.

## IV.

In his final contention Abrams asks us to say that the trial judge was in error when she dismissed his cross bill for a divorce *a vinculo* on the grounds of voluntary separation. She said she was "convinced that * * * [the parties] did not voluntarily separate." Moreover, she added, "there is, in fact, no corroboration of * * * [Abrams'] claim." Abrams argues, at length, that his wife's testimony is unworthy of belief, and,

we confess, he documents this argument quite well. However, we cannot agree with his claim that he has provided the necessary corroboration. He cites a number of our decisions which 10 years ago might have provided some support for his argument. However, since Maryland Rule S75 was proclaimed (1 January 1959) there can be no corroboration without the testimony of a "person not a party." Abrams says there is "indirect" corroboration in the testimony of his mother. We have examined her testimony and, having in mind our recent holding in *Nolte v. Nolte*, 246 Md. 328, 228 A. 2d 240 (1967), we feel bound to say that it does not measure up to what we think is required.

For the reasons stated the case will be remanded for the further proceedings hereinbefore indicated. The appellant will pay the costs.

> *Decree affirmed in part, reversed in part. Case remanded for further proceedings consistent with the views expressed in this opinion.*
>
> *Costs to be paid by appellant.*